146 F.3d 514
 R&H STEEL BUILDINGS, INC., Petitioner,
v.
DIRECTOR, OFFICE OF WORKERS' COMPENSATION PROGRAMS, UNITED
STATES DEPARTMENT OF LABOR; and Robin Irvin,
daughter of Rudolph and Betty Seibert
(deceased), Respondents.
 No. 97-3409.
 United States Court of Appeals,
Seventh Circuit.
 Argued April 23, 1998.
Decided June 16, 1998.
 
 Timothy J. Parsons (argued), Gorsuch Kirgis L.L.C., Denver, CO, for Petitioner.
 Shelby Hallmark, Department of Labor, Office of Workers' Compensation Programs, Washington, DC, Edward Waldman (argued), Christian P. Barber, Department of Labor, Office of the Solicitor, Washington, DC, for Respondent Office of Workers' Compensation Programs.
 Sandra M. Fogel (argued), Culley & Wissore, Carbondale, IL, for Respondent Seibert.
 Thomas O. Shepherd, Jr., Benefits Review Board, Washington, DC, for Party-In-Interest Benefits Review Board.
 Before BAUER, FLAUM, and EVANS, Circuit Judges.
 EVANS, Circuit Judge.
 
 
 1
 R & H Steel Buildings, Inc. performs construction work at coal mine sites. For that reason, even though it is not a coal mining company it can, under certain circumstances, be held responsible for paying benefits for its employees under the Black Lung Benefits Act, 30 U.S.C. § 901 et seq. In this case the Benefits Review Board of the Department of Labor found that R & H was, in fact, responsible for reimbursement of benefits paid on behalf of Rudolph Seibert by the Black Lung Disability Trust Fund. R & H appeals.
 
 
 2
 The appeal involves first, whether Seibert's disability was a result of pneumoconiosis, and secondly, because when he worked for R & H Seibert was a construction worker, whether he was a "miner" under the provisions of the Act and whether R & H is a "responsible operator," that is, an operator responsible for paying benefits. The appeal is from the decision of the Benefits Review Board affirming the decision of the administrative law judge. In a circumstance such as this we review the decision of the administrative law judge to see whether it is supported by substantial evidence. Zeigler Coal Co. v. Kelley, 112 F.3d 839 (7th Cir.1997).
 
 
 3
 Before we launch into the merits of the dispute, we note that the present appeal involves only the tip of the iceberg which is this case. The appeal is from the July 25, 1997, decision of the Benefits Review Board affirming the decision of ALJ Mollie W. Neal, on June 28, 1996, denying a motion for modification of the January 12, 1993, decision of ALJ Richard D. Mills. But that also is not all that happened in agency. The claim was filed on October 16, 1974. ALJ Mills denied benefits; the Board remanded; ALJ Mills again denied benefits; the Board again remanded. By now it is 1992, and Seibert died on June 21 of that year. His wife Betty pursued the claim. ALJ Mills awarded benefits; R & H filed for reconsideration. Betty died on April 18, 1993. Her daughter pursued the claim. ALJ Mills denied reconsideration. R & H appealed but then filed a request for modification, causing the Board to dismiss the appeal. Finally we reach the point where ALJ Neal issued her decision which we are reviewing, which as we said involves two issues.
 
 
 4
 Turning to the second issue first, we note that R & H is being looked to for the payment of benefits in this case because of timing. First, although Seibert worked in coal mines, as a miner, for other companies for 10 years, that employment occurred prior to December 31, 1969. R & H is the only employer who is a possible responsible operator for whom Seibert worked after 1969. If a miner does not have employment after 1969, the trust fund assumes liability for black lung benefits, but if there is an employer after that date, the last employer for which the claimant worked for at least one year is responsible for the payments. 20 C.F.R. § 725.493(a)(1).
 
 
 5
 The regulations further provide that one year of employment can be either a continuous period of employment or separate periods of employment which add up to one year. 20 C.F.R. § 725.493(b).
 
 
 6
 Thus we are confronted with two questions. Was there substantial evidence to show that Seibert was a miner within the meaning of the Act and, if so, was there substantial evidence that he worked for R & H for one year? The Black Lung Benefits Reform Act of 1977 amended the definition of "miner" so that under certain circumstances a construction worker is deemed a "miner" for purposes of the Act. Construction workers are considered miners (1) if they work in or around a coal mine or a coal preparation facility, and (2) if they are exposed to "coal dust" in the course of their employment. Title 30, U.S.C. § 902(d), provides that the term "miner"
 
 
 7
 includes an individual who works or has worked in coal mine construction or transportation in or around a coal mine, to the extent such individual was exposed to coal dust as a result of such employment.
 
 Further, 20 C.F.R. § 725.202(a) provides:
 
 8
 [T]here shall be a rebuttable presumption that such individual [a coal mine construction worker] was exposed to coal mine dust during all periods of such employment occurring in or around a coal mine or coal preparation facility for purposes of ... determining the identity of a coal mine operator liable for the payment of benefits in accordance with § 725.493.
 
 
 9
 The presumption may be rebutted by a showing
 
 
 10
 (i) that the individual was not regularly exposed to coal mine dust during his or her employment in or around a coal mine or preparation facility; or (ii) that the individual was not regularly employed in or around a coal mine or coal preparation facility.
 
 
 11
 20 C.F.R. § 725.202(a). If the periods for which R & H is unable to establish rebuttal total one year, R & H is the responsible operator liable for any benefits ultimately awarded in this case.
 
 
 12
 What the facts show as to Seibert's employment is that he was a traditional coal miner for 10 of the years between 1935 and 1955. He worked at nonmining employment from 1955-1975, when he began to work for R & H Steel Buildings in coal mine construction. He worked for R & H until 1981.
 
 
 13
 At R & H, Seibert worked at a number of coal mine construction projects. The work involved surface projects and did not involve mining. The dispute in this case is over the exact periods of time during which he was exposed to coal dust while working on the projects, for as we have seen, in order to be classified a miner he had to be exposed to coal dust during one year of his employment.
 
 
 14
 On this point the evidence before the ALJ included evidence from Seibert himself and from the two principles of R & H. John Rednour, the president of R & H, in a letter dated May 5, 1980, listed the specific projects on which it had employed Mr. Seibert, acknowledging that it did not have a personnel file on Mr. Seibert and concluding that
 
 
 15
 [t]o our knowledge, Mr. Seibert was not exposed to coal dust during his course of employment with R. & H. Steel Buildings, Inc. We base this on the fact that most of our construction is new construction where coal is not being mined. Mr. Seibert has never worked for R. & H. Steel on any type of underground construction in a coal mine. After reviewing the individual projects that Mr. Seibert has worked on for R. & H. Steel Buildings, we have not found any conditions that would suggest that he was exposed to coal dust.
 
 
 16
 At a hearing on June 26, 1986, Douglas W. Higgerson, a 50-per-cent owner of R & H Construction Company and Rednour's partner, testified that, in general, Seibert was not exposed to coal dust while employed for R & H. However, notably, Higgerson admitted that Seibert could have been exposed for short periods of time. Seibert himself testified that, at several of the projects he worked on for R & H, coal mines were in operation for at least part of the time he was present and that he was exposed to coal dust during those times.
 
 
 17
 Both Seibert and Higgerson testified regarding coal dust exposure at several specific work sites, testimony which we feel obliged to catalog briefly. First, Seibert testified that during the last 30 days of his work at Freeman United Coal's Crown # 2 Mine in Farmersville, Illinois, the mine was in operation and there was coal dust. On the other hand, Higgerson's testimony was that "we know of no coal being around anywheres near close at that particular time."
 
 
 18
 Similarly, Seibert testified that during his entire time at Old Ben Coal Company's Mine # 24 in Benton, Illinois, which he estimated to be 3 to 4 months, the mine was in operation and that he worked no farther than a football field away from the mine. But Higgerson testified that Seibert's work site was approximately 2 miles away from the coal mine and that "there was no coal there whatsoever that we know of." Rednour acknowledged that Seibert worked 52.5 days at Old Ben's Mine # 24.
 
 
 19
 Seibert says he worked for 8 months at Inland Steel Coal Company's Mine # 2 in McLeansboro, Illinois, and explained that he had coal dust exposure at this site for "a good thirty days," and, further, that the exposure came from a coal preparation plant which watered down its coal and was located 300 yards away from his work site. Rednour's letter documents a total of 145 days of employment at this site in three different stints.
 
 
 20
 About a month before he left employment at Freeman United Coal Mine's Orient # 4 Mine in Corinth, Illinois, the coal mine started operation and coal dust "was just flying around," according to Seibert. Higgerson, on the other hand, testified that Seibert worked "miles" away from any operating coal mine at this site. The men also disagreed about Seibert's work at an operating coal mine at Old Ben Coal Company in West Frankfort, Illinois. Seibert says he was exposed to coal dust for three months while Higgerson testified that Seibert worked at this site for only 9 days. Rednour's letter indicates that Seibert worked at Mine # 27 for only 5.5 days.
 
 
 21
 Seibert also worked at the Peabody Mine, 10 to 15 miles west of DuQuoin, remodeling offices and putting in new shower rooms. At that site he was exposed to coal dust from an operating mine for about 3 months. He also worked constructing a conveyor belt at Peabody Coal's site in Marisa, Illinois, for about 6 months. He testified that at the beginning of the conveyor belt, which was located near an operating coal mine, he had coal dust exposure for about 30 days. Higgerson admitted that "they might have been running some coal out of there [the Peabody conveyor belt site] at the very beginning of the project...."
 
 
 22
 The ALJ noted that the two partners in R & H, Rednour and Higgerson, gave conflicting accounts. Rednour denied that Seibert had any exposure to coal dust, but Higgerson acknowledged that there may have been some exposure. Higgerson's testimony regarding the extent of the exposure was not given from personal experience. Seibert, on the other hand, set out his work experience near the mines in some detail. The ALJ was confronted with conflicting evidence. Ordinarily, of course, her credibility determinations are entitled to deference. Here, however, the testimony of both Higgerson and Seibert on this issue was given in a prior hearing before a different ALJ from the one whose decision we are reviewing, so we do not face the usual situation in which we defer to the credibility determinations of the fact finder. Nevertheless, we do not disagree with the call the ALJ made when she chose to credit Seibert's account rather than the conflicting accounts presented by the company. The ALJ concluded that Seibert had 18 calendar months of coal dust exposure.
 
 
 23
 The Director acknowledges that the finding that there was exposure for 18 months is in error. The ALJ relied on 8 months of exposure at the McLeansboro site, whereas Seibert claims only 30 days exposure out of his 8 months employment at that site. Losing 7 months apparently leaves him with only 11 months exposure. However, the ALJ neglected to include a 30-day period at Peabody Coal's Marisa site, bringing Seibert back up to 12 calendar months of coal dust exposure, making him a miner within the meaning of the Act.
 
 
 24
 The other issue is whether there is evidence to support the finding that Seibert was disabled due to pneumoconiosis. Under 20 C.F.R. sec.727.203(a)(1) and (a)(2) a miner is entitled to a presumption of total disability due to pneumoconiosis if he establishes that he has at least 10 years of coal mine employment and can establish by X-ray evidence that he has pneumoconiosis or can establish that he has total respiratory disability by pulmonary function or blood gas studies or by a physician's reasoned opinion. The finding that Seibert has established that the presumption applies is not contested in this appeal. For that reason, we presume that Seibert was totally disabled due to pneumoconiosis. That presumption remains unless R & H can rebut it.
 
 
 25
 Section 727.203 sets out four methods by which the presumption can be rebutted. However, subsection (b)(3) is the only method at issue in this case. To rebut the presumption under § 727.203(b)(3), R & H must show that "the total disability or death of the miner did not arise in whole or in part out of coal mine employment." We have wrestled some with exactly how to paraphrase what the subsection means. In Freeman United Coal Mining Co. v. OWCP, 20 F.3d 289, 297 (7th Cir.1994), we said that "if pneumoconiosis was even a contributing factor to the claimant's disability, rebuttal under (b)(3) is not available." In Zeigler Coal Co. v. Kelley, 112 F.3d 839, 843 (7th Cir.1997), we said that we "ask whether Kelley would have been disabled notwithstanding his pneumoconiosis. If he would have been, the presumption to total disability is successfully rebutted." We have said that the company must show that black lung disease was not a contributing cause of the disability, Peabody Coal Co. v. Vigna, 22 F.3d 1388 (7th Cir.1994), and we have said the company must show that the disability was caused "entirely by an impairment other than pneumoconiosis," Patrich v. Old Ben Coal Co., 926 F.2d 1482 (7th Cir.1991).
 
 
 26
 No matter how we try to paraphrase, we cannot do better than the regulation: the company must show that the disability "did not arise in whole or in part out of coal mine employment." And no matter how it's viewed, rebuttal under this section is an uphill battle. The company is confronted with a person presumed to be disabled because of pneumoconiosis--which is a chronic dust disease of the lungs arising from coal mine employment--and it must show that the disability did not arise, even in part, from coal mine employment. In this context, we look to see what R & H offered.
 
 
 27
 The evidence in the record from proceedings prior to the decision denying R & H's request for modification, which we are reviewing, includes evidence from physical examinations in the late 1970's and early 1980's.
 
 
 28
 Dr. Parviz B. Sanjabi examined Mr. Seibert on behalf of the Department of Labor on July 26, 1979, noting that Seibert complained of shortness of breath on very heavy exertion. On the basis of a physical examination and a blood gas study, which yielded qualifying results both before and after exercise, Dr. Sanjabi diagnosed mild COPD [chronic obstructive pulmonary disease] and mild simple coal workers pneumoconiosis and indicated that the diagnosed conditions were related to dust exposure during coal mine employment.
 
 
 29
 On the other hand, Dr. Kenneth Wilhelmus examined Mr. Seibert on behalf of R & H on June 10, 1980. He obtained an X-ray which he read as negative for pneumoconiosis, a normal EKG, and nonqualifying pulmonary function and blood gas studies. His diagnosis was COPD, "probably of tobacco origin." It is undisputed that Seibert was a heavy smoker. Further, Dr. Wilhelmus said that if the miner had never smoked, "his pulmonary function test and respiratory system would be normal," whereas had the miner never worked in a coal mine, "his pulmonary function and respiratory systems would be the same as they are today."
 
 
 30
 Dr. Jaafar S. Culbertson examined Seibert at the miner's request on March 5, 1986. Dr. Culbertson obtained an X-ray which he interpreted as typical of simple pneumoconiosis, a pulmonary function study which yielded qualifying results, and a nonqualifying blood gas study. His assessment was that the miner had interstitial lung disease with associated diffusion impairment consistent with pneumoconiosis and chronic obstructive airways disease, predominantly small airways disease, which he attributed to cigarette smoking.
 
 
 31
 Upon the request for modification, R & H submitted evidence to support its claim that the miner's disability did not arise from pneumoconiosis. That evidence includes X-rays from July 26, 1991, March 16, 1992, and July 16, 1992, all interpreted as negative for pneumoconiosis by Dr. Dominic Gaziano. Also, R & H submitted an opinion written by Dr. Donald R. Darling, dated September 30, 1992, stating that the miner had chronic obstructive lung disease "that I believe was due to cigarette smoking." He also indicated that the miner had lung cancer "which was clearly related to smoking" and that Seibert's sudden death was probably due to a heart attack or a stroke. He said, "I can't find any evidence in our records that pneumoconiosis was even present...." R & H also submitted the death certificate, signed by Dr. Darling, which lists the cause of death as cardiac arrest, due to emphysema and COPD. Small cell carcinoma of the lung was listed as another significant contributing condition. No autopsy was done.
 
 
 32
 Looking at what can only be termed as inconclusive and contradictory medical evidence, the ALJ concluded that R & H had fallen short of rebutting the presumption, and we do not disagree with her conclusion. There are distinct defects in the evidence which R & H presented in support of modification. First, the death certificate may establish the cause of death but does nothing to rule out that pneumoconiosis may have been a partial cause of Seibert's disability. One can die on one ailment but be disabled from another. Secondly, X-ray evidence is not sufficient as a matter of law to establish rebuttal, 30 U.S.C. § 923(b). One study has shown that 25 percent of people with pneumoconiosis had negative X-rays. Chastain v. Freeman United Coal Mining Co., 927 F.2d 969 (7th Cir.1991). And finally, Dr. Darling's qualifications are not in the record and his "opinion" is, in fact, a rather casual letter with conclusory statements regarding his beliefs generally regarding the cause of Seibert's death. While Dr. Darling "believed" that Seibert's COPD was due to cigarette smoking and that his death was "probably" due to a heart attack or a stroke, the ALJ found the opinion too equivocal to carry the day. We are also unimpressed that the doctor could not find evidence of pneumoconiosis in his records. We do not know what sort of medical care was reflected by the records. We find that the evaluation of the ALJ should not be disturbed.
 
 
 33
 Accordingly, the decision of the Benefits Review Board is AFFIRMED.